Our last case for argument this morning is Walters v. Professional Labor Group. Mr. Noriello, whenever you're ready. Good morning, Your Honor.  May it please the Court, my name is Vince Noriello. I am counsel for the appellant defendant, PLG, in this case before you today. The issue presented to the panel today is whether the travel time of Mr. Walters and the opt-in plaintiffs in this case is compensable out of his work under the Fair Labor Standards Act. The district court erroneously ruled that it was, by what PLG will establish today through its argument, was a misapplication of the operative federal statute 29 CFR 78539. Under that regulation, can travel to a remote client ever be compensable time, under your reading of it? Yes. And how is that? Travel to a remote client is... I'm having a little difficulty picking you up. Can you just a little louder for me? Sure. Is that better? Yes. Okay. Travel to a remote client is compensable when the overnight travel to that remote job site is the time, the travel time is a substitute, a replacement, something performed in lieu of work that would otherwise be performed by that employee. For example, if you have somebody who is required, works locally, and they work, we'll talk, because it'll come up hopefully here in a few minutes, MAC, the example that was used by the district court in their ordered granted plaintiff's motion for summary judgment. You have some, MAC is hired and works 8 to 5, Monday through Friday, 40 hours a week. They drive from 7 o'clock from home, get to the job at 8, and that's their job. They prove to be proficient, and after several months, the superintendent on a Friday says, MAC, on Monday, pack a suitcase. I need you to go down three hours south of here and work at a different job site and get them caught up. Should take the whole week, so let me know when you're done. Monday morning, instead of driving to the local site here in Chicago, MAC drives three hours south, leaves her house at 7, gets there at 10. The hours from 8 to 10, if she were still here, would otherwise be performing work within the scope of her skilled trade on a job site in Chicago for the employer earning wages. But instead of doing that, she is at the request of the employer traveling overnight to a remote site. So from 8 to 10, those hours, those travel is substituting for her other duties, so she gets paid. Even though she wasn't hired to drive, she's hired to be, in this case, an electrician. Same thing on the way back. She finishes that job early, 3 o'clock. Superintendent on the site says, hey, great work. You're efficient. You've done better than I ever expected. You're done for the week. Start the weekend early. MAC drives back home from 3 o'clock to 6 o'clock. From 3 to 5, she's driving from a remote location on an overnight assignment that is substituting for the work. If she were still in town, she would be working from 3 to 5 in the shop, doing her work as an electrician. Because the overnight travel is substituting for those other duties during her regular work hours, she gets paid. That's always been PLG's position. It's always been a position of the court to address this issue. The problem is that you look at PLG Appendix 6, the court identified the very rationale that we're talking about here. The key to this whole case, the application of the regulation at issue, is the substituting duties rationale. The court, in its order, recognized the very specific reasoned rationale for when and why overnight travel time was compensable. It started at page 6 of the PLG Appendix. The court said that the substituting sentence is a rationale for the rule. The sentence declares that travel away from home is clearly work time when it cuts across the employee's work day. And then the court asks rhetorically, why is it clearly work time when it cuts across the employee's work day? And then the court answers its own question. Because during the work day, a traveling employee is simply substituting travel for other duties. If the employee were not traveling, he or she would presumably be doing some other job-related task. That makes sense, and it explains the rule. That's always been PLG's position, as I just expressed. You're assigned to a remote overnight job, and because you're driving, you're not going to do the work you normally do. The time you spend traveling is compensable. The problem is that the court cited that very specific reasoned textual rationale in the actual regulation itself, and then misapplied it to the PLG situation. The court went on to say at page 6 that every employee is, per force, substituting travel for other duties when that travel occurs during the work day. Employees work during the work day. If they are not doing one thing, they are doing something else. No, that's simply wrong. The Mr. Walters and the opt-in planners weren't simply doing something else if they weren't driving to an assignment they accepted. It's a nationally mobile workforce. They work at sites designated by clients at specific times, at specific locations, to perform a particular set of—apply a particular set of skills within a scope of a job classification. If they're not driving to get to the job site, they have no other duties. And the fallacy of the—the problem with the application of the court is it creates a very dangerous precedent that exposes employers in this circuit, at least in construction and in skilled trade staffing, any nationally mobile workforce staffing, to untenable liability. What the judge—a perfect example is at PLG appendix, page 13, talks about Mac. It says that she's hired by PLG and she's told to report to work Monday at 10 o'clock. She accepts the job and agrees. First day on—first reporting to work, the first day, leaves her house at 7 o'clock, gets there at 10. According to the district court, page 13 of the appendix, Mac, before she punches in, does a safety orientation, gets any tools, she's entitled to two hours paid for driving. Why? Because other employees already on the site started work at 8 o'clock, and if Mac survives past the first day, her regular schedule of employment is anticipated to be from 8 to 5, Monday through Friday. So she has to be paid for two hours before she—before she even starts work. And at the end of the week, if she finishes at 3 o'clock, like in the first Mac scenario, Mac is done at 3 o'clock and the superintendent says, congratulations, that's great, you were very efficient. Your next assignment we'll figure out after the production meeting today. We'll text you whether it's going to be Monday sometime next week or the following Monday. Thank you. Mac drives home. According to the district court, she has to be paid. She's entitled to compensation for driving home, even though the work she was hired to perform is done. So the employer's ironic reward for hiring people— Did the district court, though, stop the clock at the work hour, during the work hour on that travel home? Or does she get paid until she gets home? According to the district court's opinion, she would get paid until the end of the normal work day driving home. Okay. Or any travel done, if she waited until the next morning and drove from 8 to 5, it would be compensable. That would be compensable. It's drive home while you're on the work time that you apparently had just finished, or driving there while on the work time of other people who are already there. The problem is, if you take this to its extreme, you have Mac, the third scenario, she's hired on a Friday and is told to be there on Monday at 10 o'clock. She says okay. She applies for a job online, says she lives here in Chicago and is going to take the job three hours south, which she does. But at the time she has her Zoom interview on Friday for the job that she accepts, she's in Florida visiting her parents. It takes her 20 hours to drive to Chicago to start Monday at 10 o'clock. Under the district court's order, that employer now owes her 20 hours of pay for driving to work because she's out of town overnight, away from her home community, whether that's Florida or Illinois, 20 hours on the clock. Same thing when she's done on Friday. Superintendent says the same thing in Mac too. Great job. You're very efficient. We'll text you after our production meeting today whether your next assignment will be a job that starts Monday, next week, or the following Monday. I think we get the gist of the examples. And your argument essentially is that this regulation cannot plausibly apply to travel companies. And that may make sense as a business model matter, but we need a textual hook for that argument, that this regulation is inapplicable to travel companies that don't have a fixed place of business to evaluate the overnight travel against. I mean, I think that's the gist of your argument. I'm sure you are. And the very textual justification is the rationale that was cited by the district court, is that where that overnight travel is substituting for other duties, it's compensable. Where that overnight travel is not substituting for other duties, you can't have an employee that works 8 to 5 locally every day assign them somewhere else and say, well, because you're driving, you don't get paid for the day that you drive. If the driving takes the place of, is in lieu of, is a substitute for your regular daily, hourly work, then you get paid. If it isn't, you don't. Otherwise, like the judge said, that makes sense. It explains the rule. TLG agrees. Okay, thank you. Thank you. Mr. DeRose. Good morning. May it please the court. Bob DeRose, with me at counsel table, Shannon Dreher, and together we represent Mr. Walters and the 52 plaintiffs that are currently, I think now at this point, former employees of PLG. This issue in this case is simple. Did PLG violate the FLSA by failing to pay Mr. Walters and the plaintiffs for their compensable travel time? The answer is an unequivocal yes. PLG attempts to complicate a very simple regulatory structure to gloss over the fact that they failed to pay their employees for their compensable travel time. PLG admits it's 100% a travel company. Its business model is entirely based upon them, these skilled workers being at the client's location at the time the client wants them. This isn't a temporary service. These aren't people that they could have looked for at a local location. These are people that were employed with the understanding that travel was part of their work. It's even in the record in the job descriptions, SA57 to SA61. It's 100% travel. This band of brothers requires extensive travel. Under, to answer Chief Judge Sykes' question in terms of, and also Judge Brennan's, the interpretive guidance addresses this type of work. Work, driving is work. In the history of the statute, driving was work. The Portal to Portal Act came in as an exception to, well actually all time was work, all travel. Foot travel, car travel was work. Portal to Portal Act came in and was the exception. Unfortunately, PLG in its brief is calling 785.39 the exception when in fact the Portal to Portal Act was the exception in that the, it was come out of the coal mining industry where they said not all travel is compensable. We're going to accept normal, ordinary, daily commute travel from compensability. Then as you travel on to 1961, now comes 785.39 that says travel when it's not ordinary, when it's traveled overnight, it requires an overnight stay, away from the home community, and that time cuts across the work hours, that is compensable. That is the rule, not the exception. PLG logic is flawed in two important aspects. One, it tries to use the work day definition in the Portal to Portal Act, but has yet, in his briefing or in arguments today, showed how it gets around 790.7c, which basically says the definition of the work day for the purposes of the Portal to Portal Act is only for the Portal to Portal Act. You can only use it for daily travel, daily commute travel. Now, 785.39 is the basis upon which Judge Sweeney, below, based on the record that contained stipulations, uncontested facts, found there was no genuine issue of material fact that the time that Mr. Walters and the plaintiffs were traveling away from their home community, that required an overnight stay, that cut across their normal working hours, was compensable. Even at the podium, PLG uses the phrase rationale, and Judge Sweeney was pretty specific when he was talking about the substituting duties. It's not the rule. It's the rationale for the rule. When you look at 785.39, the rule is, is the travel away from the home community, is it overnight, and does it cut across their normal working hours? That's the rule. The rationale is, is because they're traveling, because driving is work, they are substituting their duties of driving and travel for where they would otherwise be working. Then it goes on to give a description of some examples. We believe that Judge Sweeney was correct in finding that this travel, the travel described by Mr. Walters and the plaintiffs, falls squarely within 785.39, and is compensable, and that every attempt to overcomplicate this issue, to sort of mishmash the definitions of both the Porter Portal Act and 785.39, notwithstanding, this is a clear case where this travel is compensable, and Judge Sweeney's decision should be affirmed. The Department of Labor filed an amicus brief arguing that all of the travel time is compensable, not just the travel time during normal work hours, and you're not joining that argument. Well, we don't disagree with that argument. Our decision to only do the hours that cut across the normal work hours was a trial management decision because this was going to be tried on a representative basis, and there are 785.40 and 785.41 that talk about whether you're a passenger, whether you were offered a plane ride and you drove. Because we were going to have to do it on a similarly situated basis, we chose to stick with the hours that we could prove across our case. We don't disagree with their position. It's just not what we presented to the judge. Right, so you're not making a claim for all of the travel time.  That's particular to this case, and that's why their brief, we don't disagree with it. It's just not the facts as they were presented for our case. Right, and if you had wanted to take that position, you'd have to file a cross appeal because you'd be enlarging your recovery. Right, and we're not. We're not asking for more. We are fine with Judge Sweeney's decision. We know that what he said about limiting or suggestion they might limit it was dicta, and we adopted the Secretary's position that we don't want that to be read as law. We want to be clear that that was a trial management decision based on the fact that we had a certified class, and we want to make sure that we had representative evidence at trial. Or a collective. It's an opt-in. I'm from the Sixth Circuit, Your Honor, under Clark. That's a bad word, so I've conditioned myself not to use collective. It's refreshing to be here in the Seventh Circuit and being able to use that, but not those of us who practice in the Sixth Circuit. Got it. Okay. Anything else? If there are no other further questions. Okay. Thank you. Mr. Noriello, you had used all your time, but if you've got something in rebuttal, I'll give you a little extra time. Thank you. I simply wanted to add with regard to the Assistant Secretary's amicus brief, the identical argument for expansion of 78539 was advanced in Bassett v. TBA. It was soundly rejected. The other times it's been cited or attempted to be advanced, it was rejected by the District Courts, most recently in the Diefenbach case. And all of the authority cited in the Assistant Secretary's amicus brief for support of the expansion is from pre-1961, before 78539 was promulgated. Finally, I want to wrap up with saying that the employees that were hired, the PLG employees, opt-in plans and otherwise, were skilled tradespeople, carpenters, electricians, plumbers, masons. Driving was work. They were not hired to drive. They were hired to use their hands and apply a skilled trade on designated jobs at designated locations that they agreed to work at. Just like the consultants in Abell v. Skybridge, just like the software technicians in the Bora case. That Eighth Circuit District Court decision and the Sixth Circuit Court of Appeals decision in Skybridge, even though it was applying the FLSA in the context of the Kentucky State Wage and Hour Act, said where you do not have the substituting duties rationale, as stated in the rule, overnight drive time is not compensable. We've got this district court that says otherwise, and at the end of the day, the problem is a serious one for employers because in the MAC scenario, where you're adding 20 hours of drive time at the beginning of a shift and 20 hours of drive time at the end of the shift, artificially increasing the labor cost of a job, it's going to ultimately be expensive for employers and expensive for consumers. And finally, right now, the way PLG does it, as stated in the record, is 67 cents an hour IRS mileage reimbursement. So a 200-mile commute is $201, straight non-wage employment expense reimbursement to the employees. It costs a lot these days to take an F-250 packed with tools and pull in a trailer to drive three hours, 200 miles. Under the district court scenario, you'd be forcing employers, specifically PLG and others, to pay an hourly wage, even if those same employees, those same pros, were getting $30 an hour, or their overtime rate of $45 an hour, gross, less tax. They're getting less toward their employment-related expenses under the district court's rationale by 50% or more. So who winds up getting it in this case? Who gets the short end of the stick? The workers, again, because we've got lawyers that want to create a cottage in the street through some clever construction of a regulation that has never, ever, ever been applied in this scenario, as stated in Able and Board. Thank you, Your Honor. One question, just sort of globally. You work in this area. Do you have a sense of what percentage of construction is handled by temp travel agencies like your client at this point? Is it getting to be like the nursing field where travel nurses are staffing hospitals to a much greater percentage than it used to be? Yes, health care professional staffing has ballooned, especially since COVID, for different reasons. But skilled grade construction, temporary services that provide a variable skilled trade workforce that is, like nurses say, that's PRN, on call. They take as many people as they need or whatever trades they need for as long as they need them, and they're allowed to control their labor costs rather than have people sitting with non-productive hours. So of all of the industry serviced by temporary agencies, construction and health care are one and two. And is this union or non-union? The employers or the country? Your company, your employees. The PLG doesn't recognize any labor organization. But in terms of a number of the employees that work for PLG in a range of the different skilled trade classifications are union members. We just don't recognize. We don't have a bargaining obligation with any particular labor organization. Got it. Okay. Thank you. Thank you. Our thanks to all counsel. The case is taken under advisement.